IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 19-20065-01 DCC |
| v. | ) | |
| | ) | |
| ALAN NOLTENSMEYER, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S RESPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through Kim I. Flannigan, hereby responds in

opposition to the defendant's sentencing memorandum. In support of its position, the United

States submits the following:

I.      BACKGROUND

On September 2, 2020,  the defendant plead guilty to one count of possession of child

pornography in violation of Title 18 U.S.C. § 2252 (a)(4)(B). The defendant was identified during

the course of a nation-wide investigation targeting individuals who were using a hidden TOR

network to share child pornography.

The TOR Network

TOR is a computer network which anonymizes Internet activity by routing a user's

communications through a global network of relay computers (or proxies), thus effectively

masking the internet-protocol ("IP") address of the user.  An "IP address" is a unique numeric

address (used by computers on the internet) that is assigned to properly direct internet traffic. A

1

publicly visible IP address can allow for the identification of the user and his/her location.

To access the TOR network, a user has to install freely available TOR software, which relays only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address. There is no practical method to trace a user's actual IP address back through those TOR relay computers.

The TOR network makes it possible for a user to operate a special type of website, called "hidden services," which uses a web address that is comprised of a series of 16 algorithm-generated characters (such as "asdlk8fs9dflku7f") followed by the suffix ".onion." Websites, including hidden services, have system administrator(s) (also called the "admin(s)") who are responsible for overseeing and operating these websites. In order to access "hidden services" the user must know the web address.

Playpen was a child pornography bulletin board and website dedicated to the advertisement, and distribution of child pornography, and was accessible only to users within the TOR network. It provided discussions related to matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children. Unlike the traditional internet, a user could not simply search for the Playpen website within the network. The defendant had to obtain the web address for that site directly from another source, such as other users, or from online postings describing the content of the website and its address. Only registered members were allowed access to Playpen. New users were required to register with a username and password and were required to enter an email address that looks valid. However, users were instructed not to enter a real email address. The instructions went on to note, "[F]or your security you should not post information her that can be used to identify you." After

successfully registering and logging into the site, the user could access any number of forums and sub-forums including: (a) jailbait-boy; (b) jailbait-girl; (c) preteen-boy; (d) preteen-girl; (e) toddlers; (f) Preteen HC (boy and girl); (g) Kinky Fetish-Scat. The initials HC stand for hard core and depict penetrative sexually explicit conduct.

**Defendant's activity on Playpen**

The defendant originally registered an account on the website on January 2, 2015, with the username "marcus."  According to the profile submitted, his personal text stated, "Watch out Playpen newbie here."

On February 26, 2015, the defendant accessed 19101 entitled "Falko anal 1920x1080 359mg 7 min long."  The post contained a link which portrayed one photo, which contained 16 separate child pornography images.  The images depict a prepubescent female who was being anally penetrated by a male's penis. One of the other images depicts the same prepubescent female being orally penetrated by the penis of a male. Among other things, this post contained the user "sexmongrol" posting the following comment," you don't have to download it but its's hi definition video of a guy assfucking a beautiful 5 year old girl!

During the following additional session on the same date, the defendant accessed post 3995 entitled "200Pics of Cousins Faith 203 yo &Grace 6yo. Now 198 of Jada 6-8 yo-New Hosts in the forum" Girls HC." The post contained links containing multiple photos, each of which depicted images of nude toddlers and nude prepubescent females in engaged in various sexually explicit activities.  The defendant also accessed post 19096 entitled, "Perfect Blue Pack-(My Avatar Girl)" int the forum "Girls HC." The post contained links which contained multiple photos each of which depicted images of nude toddlers and/or nude prepubescent females, commonly referred to as

contact sheets, engaged in various sexually explicit activities. One of the contact sheets depicts a nude prepubescent female being orally penetrated by the penis of a male.

After identifying the defendant through his IP address, a federal search warrant was obtained for the defendant's home address in Overland Park, Kansas. The warrant was executed on September 21, 2015. During the search, numerous electronic media devices were seized for examination at the FBI Regional Forensic Crime Laboratory (RCFL). Shortly after the search warrant was executed, the defendant was interviewed and admitted to using the internet to access multiple websites containing child pornography via the TOR network. He initially denied that he was specifically looking for child pornography but had "come across" them while playing around on TOR. He also admitted saving and transferring numerous files containing child pornography to an external hard drive. The defendant stated he saved the material not because he viewed it for "getting off" but because he could not believe he found it. He denied ever masturbating to the material.

On March 22, 2016, the RCFL completed its examination and sent the report to the agent. The report indicated there were approximately 2400 images of child pornography located on an external hard drive and on an optical disc. Fifteen of the images depicted children engaged in sexually explicit conduct with animals. Eleven of the images portrayed children in bondage or being sexually tortured. The exam revealed a folder created by the defendant labeled "KC Sarah" which contained 57 images of what was first thought to be a local child.[1] The examiner was able to recover search terms used by the defendant to locate child pornography. In addition to the images, the examiner found 152 video recordings of child pornography which included

---

[1] Agents reviewed the material and were able to rule out local children.

two videos of children engaged in sexually explicit contact with animals, and seven that portrayed scenes of bondage and torture.

After the search of the defendant's home, and before his indictment, litigation commenced regarding weather the search of the Playpen server that was the subject of the nationwide investigation was lawful.  FBI agents had obtained a search warrant from a magistrate judge in the Eastern District of Virginia.  The warrant allowed the FBI to install software onto the Playpen server, and when the server was accessed, the software would automatically install malware onto the users computer.  This Malware would search the users computer for identifying information.[2]  Courts all over the country were addressing the issues raised from the techniques used to identify these child pornography defendants.  The Tenth Circuit decided *United States v. Workman*, 863 F.3d 1313 (10th Cir. 2017) *cert. denied* 138 S.Ct. 1546 (April 16, 2018*), on* July 21, 2017.  *Workman* held that even though the evidence was illegally obtained, it was admissible based up the good faith exception. "But evidence illegally obtained can be admitted in some circumstances when the executing agents rely in good faith on a warrant subsequently determined to be invalid." *Id*. at 6.

The government rightly delayed any action on the defendant's case in order to ensure the evidence needed for a successful prosecution would be admissible at any future trial.

## II.    SENTENCING CALCULATIONS

### A.  Statutory Penalties

The offense of Possession of Child Pornography, in violation of 18 U.S.C. 2252(a)(4)(B), carries a maximum sentence  of  20 years imprisonment, if the offense involved a prepubescent

---

[2]  *United States v. Workman*, 863 F.3d 1313 (10th Cir. 2017).

minor, or a minor who had not attained 12 years of age, a fine of not more than $250,000 and a term of supervised release of not less than 5 years or life pursuant to 18 U.S.C. §3583(k).

### B.  Guideline Range

The government agrees with the calculation of the defendant's Guidelines sentencing range contained in the pre-sentence report (PSR).  The PSR correctly provides for a base offense level of 18 *See* PSR ¶ 40. The government agrees with the PSR that several specific offense characteristics apply; the material involved prepubescent minors or minors under the age of 12; the offense involved material that portrayed sadistic or masochistic conduct, and or other depictions of violence, as well as the sexual exploitation of infants or toddlers; the offense involved the use of a computer; and the offense involved more than 600 images. *See* PSR ¶¶ 41-44.

The defendant is entitled to a two-level reduction for acceptance of responsibility, and the government hereby moves to decrease the defendant's offense level one additional level because he timely notified the authorities of his intention to enter a guilty plea.  As a result, the defendant's total offense level is 28. *See* PSR ¶ 52.

With an offense level of 28 and a Criminal History Category I, the defendant's Guideline Range is 78-97 months. *See* PSR ¶ 90.

### III.   GOVERNMENT'S RECOMMENDATION

### A.  Application of the Federal Sentencing Guidelines

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington,* 124 S. Ct. 2531 (2004).  As a consequence, the

Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker,* 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See United States v. Gall,* 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.*  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

Notably, the United States Sentencing Commission conducted a hearing on the child pornography sentencing guidelines on February 15, 2012.  Department of Justice (DOJ) employees James Fottrell and Steve DeBrota, and former DOJ employee Francey Hakes provided the following testimony regarding how technological advances were exacerbating the

7

threats posed by child pornography offenses:

> In the last ten years, we have seen a sharp increase in the severity and depravity of child pornography offenses, fueled in large part by *swiftly advancing technological changes* which permit offenders to easily store large numbers of images of child sexual abuse, to create safe havens online where they can communicate and bond with other individuals who encourage and promote the sexual exploitation of children, and to utilize sophisticated methods to evade detection by law enforcement.  This increase is reflected in the changes in the content of the images over time, as infants and toddlers are now regularly victimized by child pornography offenders and the victims are forced into more brutal and degrading sexual activity.
>
> Additionally, *the technological changes that continue to make it easier for offenders to commit these crimes* are reflected in the number of defendants prosecuted in federal court for child pornography offenses, which has increased every year for over ten years.
>
> We are also seeing the crime change with respect to the *technical complexity and sophistication of the offenders who exploit the developments in both software and hardware*.  Storage capacity on hard drives and external media has exploded at the same time that prices for such equipment have dropped, making it feasible for individuals cheaply to store millions of image and video files. Internet speeds have skyrocketed, allowing users to download a video in a matter of seconds that, just a few years ago, would have taken hours. At the same time, smart phones and the development of faster wireless networks have turned phones into a viable and portable alternative method to distribute and collect child pornography. *New platforms are being constantly developed to allow individuals to chat, network, and share files. Child pornography offenders are early adopters of these platforms, co-opting them to further their criminal purpose and to create virtual communities that exist outside the bounds of normal society and that embrace and promote the sexual exploitation of children.* Finally, offenders are *exploiting the development of new technologies*, such as evidence eliminating software, encryption, and methods to conceal their Internet activities, *to evade detection by law enforcement.* The result of these changes is clear: we are seeing more and more offenders, engaged in more sophisticated criminal conduct, exploiting a larger number of children in a more depraved way.

*See*        https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf (emphasis added).

Moreover, on November 13, 2013, Acting Assistant Attorney General Mythili Raman testified before the Senate Committee on Homeland Security and Governmental Affairs provided the following testimony regarding the unique threat posed by cryptocurrency, including as to child

pornography offenses:

> As virtual currency has grown, it has attracted illicit users along with legitimate ones. Our experience has shown that some criminals have exploited virtual currency systems because of the ability of those systems to conduct transfers quickly, securely, and often with a perceived higher level of anonymity than that afforded by traditional financial services. The irreversibility of many virtual currency transactions additionally appeals to a variety of individuals seeking to engage in illicit activity, as does their ability to send funds cross-border.
>
> Cyber criminals were among the first illicit groups to take widespread advantage of virtual currency. We have seen that many players in the cyber underground rely on virtual currency to conduct financial transactions. *Early users of virtual currency also included criminals involved in the trafficking of child pornography*, credit card fraud, identity theft, and high-yield investment schemes. As virtual currency became more widespread and criminals became increasingly computer savvy, other criminal groups moved to capitalize on virtual currency, as well. There are now public examples of virtual currency being used by nearly every type of criminal imaginable.
>
> It is not surprising that criminals are drawn to services that allow users to conduct financial transactions while remaining largely anonymous. And, indeed, *some of the criminal activity occurs through online black markets, many of which operate as Tor hidden services.* Tor hidden services are sites accessible only through Tor, an anonymizing network that masks users' Internet traffic by routing it through a series of volunteer servers, called "nodes," across the globe. *Online black markets capitalize on Tor's anonymizing features to offer a wide selection of illicit goods and services, ranging from pornographic images of children* to dangerous narcotics to stolen credit card information.

*See* https://www.justice.gov/opa/speech/acting-assistant-attorney-general-mythili-raman-testifies-senate-committee-homeland (emphasis added).

### B.  Basis for the Government's Recommendation

The government submits that a sentence at the low end of the guidelines is appropriate and warranted in this case and specifically recommends a period of supervised release of 10 years based on the factors in 18 U.S.C. § 3553(a).  The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

1.     **Nature and Circumstances of the Offense**

As set forth above and consistent with the Justice Department testimony noted above, the defendant's use of the dark web and technologically-advanced online black markets made tracking his activities exponentially more difficult to discover by law enforcement and demonstrates the growing threat posed by such technology in the child exploitation realm.   The defendant specifically sought out and participated in this online safe haven that fostered the mutual encouragement and promotion of the sexual exploitation of children.

It goes without saying that child pornography causes real and lasting harm in our society. It is not just about images and videos; it is about real children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly sexually abused.  Individuals— like the defendant—who promote child pornography offenses are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos. As the Supreme Court recognized in the seminal case of *New York v. Ferber*:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole.  It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.
>
> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10 (1982).  The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography . . . .  It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." *Id*. at 759 n.10.  Victims must

10

cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse.

Several of the victims and the parents of victims whose images the defendant possessed submitted victim impact statements.  The victim impact statements share a common theme:  the victims must cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse.  They are revictimized – continuously exploited – by each consumer of child pornography.  Here, the defendant participated in and fueled this exploitative industry, as evident by his use of The Website and videos viewed by him that depicted child pornography.

### 2.    History and Characteristics of the Defendant

In most criminal cases, a defendant will appear for sentencing and offer mitigating evidence, asking the Court to consider the defendant's sometimes less obvious, but positive attributes.   In child-exploitation related crimes, however, a defendant's good qualities are frequently the easiest to see.  Defendants appear to be like any other law-abiding citizen—they work, worship, and have the support of their families.  Their crimes against children, and the reasons they commit them, have been hidden from colleagues, friends, and loved ones.  Despite that fact, the perpetrator's private crime is a horrific one, and offenders must be held accountable for the damage they have done.

Here, the defendant has no criminal record.  He indicated relatively soon after he was charged a desire to accept responsibility and plead guilty in this case.  However, the government has already taken these mitigating factors into account when the government extended a plea to Possession of Child Pornography, in lieu of Receipt of Child Pornography, which would have

required a 60-month mandatory minimum period of incarceration.  Further, the government has continued to take these mitigating factors into account in its recommendation of a sentence at the low end of the guidelines.

### 3.    Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses.  The defendant's possession of over 2400 images and 152 videos of child pornography result in the promotion of  child exploitation which has harmed society at large and specifically, child victims, and thus warrants a sentence of imprisonment.  Moreover, a term of supervised release with conditions including sex offender assessment and treatment is important to ensuring that the defendant receives the continuing treatment and support that will ensure he does not commit any additional crimes in the future.

### 4.    Available Sentences and Supervised Release Conditions

The defendant should be sentenced to a term of incarceration.  The defendant is in Zone D of the Guidelines, and thus a probationary sentence would be a departure from the Guidelines.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 10 years.  Supervised release is critical because it will subject the defendant

to ongoing monitoring and ensure that he does not revert back to his criminal conduct when he finds himself facing a life challenge or obstacle.

The conditions of supervised release should include the following conditions, which are conditions imposed in similar child exploitation cases and conditions:

(1) The defendant must submit to searches of his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, and effects, at any time, with or without a warrant, by law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

(2) The defendant must undergo and comply with sex offender evaluation and treatment. This may include the use of polygraph testing as part of the therapeutic process.

(3) The defendant's use of the Internet, computers, and any other Internet-capable devices will be restricted and monitored.

(4) The defendant will not have direct contact with minors without the written approval of probation.  This also entails both an employment/volunteer restriction and residential restriction, in that the defendant shall not be employed in any capacity, or participate in any volunteer activity, which may cause him to come in direct and/or unsupervised contact with children for more than momentary duration without advanced approval by the United States Probation Office, and the defendant shall have all residences pre-approved by the United States Probation Office.  Specifically, the defendant shall not live in a residence where minor children also reside without the permission of the United States Probation Office.

As it relates to the above conditions, first, the defendant will be required by statute to register as a sex offender as a result of his convictions in this case. Second, the defendant's crimes stem from his online communications. Thus, the defendant's use of the Internet to commit his crimes justifies monitoring his future use. Third, the defendant's collection of child pornography material justifies monitoring his direct contact with any minors and supports the imposition of sex offender evaluation and continued sex offender treatment.

### 5.      Avoiding Unwarranted Sentencing Disparity

One of the statutory factors to consider at sentencing is the need to avoid unwarranted disparity. Indeed, avoiding such uncertainty and disparity was one of the purposes for the creation of the Sentencing Guidelines. Adherence to the sentencing guidelines help ensure that similarly situated defendants are sentenced similarly.

It is without dispute the defendant indicated early on that he accepted responsibility and wished to plead guilty. Accordingly, the government's recommendation, at the low end of a guideline sentence, is appropriate based on the factors presented in this case.

### 6.      Restitution and Victim Impact Statements for the Victims

The government has been in communication with the victims' lawyers and defense counsel. The defendant has agreed to pay $3000 for each victim identified in the pre-sentence report. This amount will be included in the Judgment and Commitment Order by the Court at the time of sentencing. The government acknowledges and is appreciative of the defendant's willingness to cooperate with his restitution obligations without the need for protracted litigation in court.

### 7.    Downward Variance Unwarranted

The defendant seeks a downward variance from his properly calculated guideline range. Such a variance is unwarranted given the facts and circumstances of this case as set out above. The defendant took advantage of a network designed to provide protection for its members, by hiding their illicit activities from law enforcement. The defendant took affirmative steps to join a website whose content was created exclusively from the sexual exploitation of children. This site catered to individuals whose sexual desires required the abuse of children, some of them infants and toddlers, in the most horrific manner. The defendant excitedly joined this site knowing its content by exclaiming, "Watch out Playpen newbie here."

## IV.    CONCLUSION

For all of the reasons set forth above, the government recommends that the Court sentence the defendant to a term of imprisonment at the low end of the guidelines, to be followed by 10 years of supervised release, with the recommended conditions of supervision.

Respectfully Submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas

 s/Kim I. Flannigan
 KIM I. FLANNIGAN, #13407
 Assistant United States Attorney
500 State Ave., Suite 360
Kansas City, KS 66101
Tele: (913) 551-6730
Fax: (913) 551-6541
Kim.Flannigan@usdoj.gov

15

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2021, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record in the above-captioned case.

 *s/Kim I. Flannigan*
KIM I. FLANNIGAN, #13407
Assistant United States Attorney